# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Murphy Ray Kittrell, III,<br><br>　　　　　Defendant. | **CR 10-2903-TUC-RCC (JCG)**<br><br>**REPORT & RECOMMENDATION**<br>**re: Motion to Suppress** |

Pending before the Court is a Motion to Suppress Evidence Seized filed by Defendant on March 14, 2011. (Doc. 34.) The government filed a response to the Motion on March 25, 2011. (Doc. 34.) Defendant filed a reply on April 11, 2011. (Doc. 44.)

This matter came before the Court for a report and recommendation as a result of a referral made on December 7, 2010, pursuant to LRCrim 5.1. (Doc. 6.) This matter was set for evidentiary hearing and evidence was heard on April 13, 2011. (Doc. 46.) Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress Evidence.

//

//

//

//

**FACTUAL FINDINGS**

**1.     Testimony of Bureau of Alcohol Tobacco Firearms and Explosives Special Agent Rustin Wayas**

Bureau of Alcohol Tobacco Firearms and Explosives (ATF) Special Agent Rustin Wayas testified on behalf of the government. Agent Wayas has been employed by ATF since approximately June, 2007. In the course of his employment at ATF, he has investigated a number of cases involving firearm offenses in connection with drug trafficking offenses. Prior to his employment with ATF, he served as a Border Patrol agent and an Immigrations and Customs Enforcement agent. As a law enforcement officer, he has encountered marijuana on approximately 50 to 75 occasions, typically large quantities of raw marijuana. Agent Wayas testified that raw marijuana can be recognized by its packaging, its very distinct smell, and its appearance. Agent Wayas described himself as "very familiar" with the smell of marijuana. He stated that raw marijuana odor can be smelled through packaging, is difficult to disguise, and can linger in areas for some time after the marijuana is removed. According to Agent Wayas, raw marijuana can be broken into pieces small enough to fit down a sink drain or flushed down a toilet.

On June 23, 2010, Agent Wayas assisted ATF Special Agent Creighton Brandt with a knock-and-talk at Defendant's home, a two-story house with an attached garage.[1] Another agent assisted as well. Approximately a minute after Agent Brandt knocked on the door, the agents could hear a baby inside the house. Agent Brandt knocked again and after another one or two minutes Defendant's girlfriend, Priscilla Trevino, opened the door holding a baby. Agent Wayas immediately felt cool air rushing out from the house and smelled marijuana. The agents turned to each other and confirmed that each of them had noticed the strong odor of marijuana. Agent Brandt introduced himself and Agent Wayas as ATF agents and asked if Defendant was home. Ms. Trevino stated that Defendant was not at home. Agent Brandt asked Ms. Trevino if she was aware that the residence smelled like marijuana; Ms. Trevino

---

[1] The knock-and-talk was initiated based on a tip from an individual arrested a few days earlier that the residence contained firearms and marijuana.

- 2 -

1 stated that she was not aware. Ms. Trevino attempted to close to door, saying that she would 2 call Defendant on her cell phone. Agent Brandt put his foot in the door to prevent it from 3 being closed and advised Ms. Trevino that she could be escorted to the phone or use his 4 phone. Ms. Trevino did not want the agents to enter the home.

5 Agent Brandt initiated steps to obtain a search warrant for Defendant's residence. 6 Approximately one hour after making contact with Ms. Trevino, while the agents were 7 waiting for the search warrant, Defendant exited the house. Defendant told the agents that 8 he had entered the house by jumping the back fence and entering through the back door.

9 When Agent Wayas entered the home after having receiving the search warrant, Agent 10 Wayas again smelled a strong odor of marijuana. According to Agent Wayas, several other 11 agents entering the home to execute the warrant also commented on the strong odor. Agent 12 Wayas described the smell as being strongest near the front entry but also noticeable 13 throughout the house. Agent Wayas searched the upstairs portion of the house; in the 14 bathroom he discovered containers with pieces of marijuana inside and noticed pieces of 15 marijuana inside the bathroom sinks. This caused Agent Wayas to suspect that marijuana 16 had been rinsed down the drains in an attempt to destroy evidence.

17 **2.     Testimony of Detective Ewings**

18 Tucson Police Department Detective Mark Ewings testified on behalf of the 19 government. Detective Ewings has eight year's experience as a law enforcement officer. He 20 is currently assigned to the street narcotics section of the Counter Narcotics Alliance; 21 approximately 25% of his investigations involve marijuana. In the course of his career, 22 Detective Ewings estimates that he has investigated approximately 125 marijuana-related 23 cases and assisted in the investigation of hundreds more. Detective Ewings testified that 24 marijuana has an unmistakable odor that is often detectable even after efforts have been made 25 to disguise it and that it may linger long after the marijuana is removed. Hydroponic 26 marijuana has a stronger odor than commercial marijuana because of the method used to

27
28

1  grow it.² Detective Ewings has detected small quantities of hydroponic marijuana even at
2  some distance based on its odor.

3        On June 23, 2010, Detective Ewings responded to Defendant's house at the request
4  of his supervisor. Agent Brandt advised Detective Ewings that he and other agents had
5  knocked on the door and when it was opened they had detected a strong odor of fresh
6  marijuana coming from inside the house. Detective Ewings applied for a telephonic search
7  warrant based on Agent Brandt's briefing. Detective Ewings testified that based on his
8  training and experience and Agent Brandt's briefing, he expected the search to reveal
9  quantities of marijuana indicating possession with the intent to distribute, as well as weapons
10 and monies. Detective Ewings obtained a search warrant for the search of Defendant's house
11 from a Superior Court Judge in Pima County.

12       Detective Ewings entered the residence after ATF had conducted its initial sweep. He
13 immediately observed a strong odor of fresh marijuana and the odor of air deodorizers. He
14 also observed marijuana residue over the sink basins and the bathtub, indicating to him that
15 someone had attempted to dispose of the marijuana prior to service of the warrant. Based on
16 his training and experience, Detective Ewings testified that people can and will flush
17 marijuana down sinks and bathtub drains in an attempt to avoid detection. Detective Ewings
18 observed empty vacuum seal bags that smelled strongly of marijuana; in his experience these
19 bags are used to attempt to disguise the odor of the marijuana. Detective Ewings also noticed
20 mason jars containing marijuana; in his experience mason jars are used to protect marijuana
21 buds from being compressed or destroyed. According to Detective Ewings, hydroponic
22 marijuana is more valuable than commercial marijuana and greater care is used in storing it
23 by using, for example, mason jars rather than bags. Detective Ewings discovered hydroponic
24 marijuana buds in mason jars in the bathroom closet. Two freezer bags filled with
25 commercial marijuana were discovered in a backpack inside an SUV in the garage.³ Drug

---

²Hydroponic marijuana refers to marijuana that is grown in liquid.

³ Detective Ewings described the garage as an attached garage accessible from the inside of the house.

- 4 -

1  ledgers were discovered in the center console area of the vehicle.  Bags of marijuana or
2  marijuana residue were also found in the kitchen, master bedroom closet and the garage
3  workbench.
4        Detective Ewings testified that approximately 2.8 pounds of marijuana was discovered
5  in the residence.  The bulk of the seized marijuana was found in the backpack inside the
6  vehicle; approximately 29-32 grams of marijuana was found inside the residence. Detective
7  Ewings testified that in his experience, this quantity of marijuana is consistent with
8  possession with intent to distribute.  Detective Ewings testified that other evidence also
9  supported his conclusion that Defendant intended to distribute/sell marijuana, including drug
10 ledgers, scales and large amounts of cash as well as the absence of marijuana use
11 paraphernalia.  On cross-examination, Detective Ewings acknowledged that rolling papers
12 and a marijuana grinder, consistent with marijuana use, were also discovered in the
13 residence.
14 **3.     Testimony of Special Agent Brandt**
15       Agent Brandt testified on behalf of the government.  Agent Brandt has served as an
16 ATF special agent for two years.  Prior to that, he served for over eleven years as a police
17 officer for the Colorado Springs police department; during some of that time he worked on
18 a firearms and narcotics task force.  As part of his police officer training and his ATF training
19 Agent Brandt was exposed to the smell of fresh and burnt marijuana.  Agent Brandt
20 estimated that he has encountered fresh marijuana approximately 75 to 100 times in his law
21 enforcement career.  He described marijuana odor as capable of permeating packaging and
22 lingering for a long time after removal of the marijuana itself.
23       On June 23, 2010, Agent Brandt arrived at Defendant's residence for a knock-and-talk
24 with Agent Wayas and another ATF agent.  Agent Brandt knocked on the door and waited
25 approximately one-and-a-half minutes. He heard a baby inside so he continued to knock and
26 after another two minutes a woman holding a baby answered the door.  When she opened the
27 door Agent Brandt immediately felt a rush of cool air and smelled a strong odor of marijuana.
28

1 Agent Brandt conveyed his observations to Detective Ewings and approximately forty-five
2 minutes later a search warrant was obtained.
3       Agent Brandt was one of the first to enter the house upon execution of the warrant.
4 Immediately upon entering the house he noticed a strong scent of marijuana; he testified that
5 the odor was pervasive throughout the house. According to Agent Brandt, agents discovered
6 pieces of "shake," small fresh bits of marijuana, as well as larger quantities of marijuana.
7 Another officer reported to Agent Brandt that someone had removed the cover from a drain
8 in the master bathroom tub and attempted to destroy marijuana by flushing it down the drain.
9 Agent Brandt also testified that marijuana was discovered in a vehicle parked in the garage,
10 which he described as an attached garage accessible from inside the residence. Agent Brandt
11 stated that some of the marijuana seized appeared to be hydroponic marijuana and that other
12 items seized, such as drug ledgers, scales and firearms, suggested that Defendant was
13 trafficking hydroponic marijuana. Agent Brandt also stated that hydroponic marijuana has
14 a stronger odor than commercial marijuana.

15 **4.     Testimony of Tucson Police Department Detective Lonnie Bynum**

16       Detective Bynum was called to testify by Defendant. The parties stipulated that
17 Detective Bynum has previous law enforcement experience including some service with the
18 Counter Narcotics Alliance. Detective Bynum interviewed Defendant during the search of
19 his residence. Detective Bynum testified that he noticed an "overwhelming" odor of
20 marijuana in the residence immediately upon entering. Detective Bynum observed the
21 vehicle in the garage before the marijuana was discovered inside; the vehicle was locked and
22 the windows were up. Detective Bynum observed marijuana in the residence and testified
23 that, based on his training and experience, it appeared to be hydroponic marijuana. Detective
24 Bynum opined that hydroponic smells five to ten times stronger than commercial marijuana.

25 **5.     Testimony of Jeremy Mahadocon**

26       Mr. Mahadocon grew up with Defendant. He arrived at the Defendant's house on the
27 morning of June 23, 2010 and entered the house to use the restroom and play with the dogs.
28 Mr. Mahadocon testified that he is familiar with the smell of marijuana because he has

1  smoked it more than once and has been around people who have smoked it.  Mr. Mahadocon
2  testified that he did not smell marijuana in Defendant's residence on the morning of June 23,
3  2010.

4          On the morning of June 23, 2010, Mr. Mahadocon drove Defendant to visit his father
5  in the hospital.  In the afternoon, Defendant received a phone call from his girlfriend and told
6  Mr. Mahadocon that he needed to go home.  The Defendant told Mr. Mahadocon to drop him
7  off a street away from Defendant's residence, which Mahadocon did.  Mahadocon wondered
8  why, but did not ask questions.

9  **6.     Testimony of David Adams**

10          Mr. Adams testified on behalf of Defendant.  Mr. Adams is Defendant's father's
11  business partner and has known Defendant since he was born.  He described their
12  relationship as an uncle/nephew-type relationship. Mr. Adams visited Defendant's residence
13  for approximately 15 minutes, one or two days before his arrest.  He walked through both the
14  downstairs and upstairs parts of the residence.  Mr. Adams is familiar with the scent of
15  marijuana because he has been around people who have smoked it.  He did not observe the
16  odor of marijuana in Defendant's residence.

17  **7.     Testimony of David Laughlin**

18          Mr. Laughlin testified on behalf of Defendant.   Mr. Laughlin is a friend of
19  Defendant's and was at his residence the day before he was arrested.  He visited with
20  Defendant in the living room for fifteen or twenty minutes.  Mr. Laughlin is familiar with the
21  odors of fresh and burnt marijuana.  He did not smell marijuana in Defendant's residence
22  during his visit.

23  **8.     Testimony of Cecelia McCauley**

24          Ms. McCauley testified on behalf of Defendant.  Ms. McCauley is Defendant's
25  girlfriend's mother. Ms. McCauley was in Defendant's residence on the morning of June 23,
26  2010 for approximately 20 minutes.  She walked through the downstairs and the upstairs
27  areas of the residence.  Ms. McCauley is familiar with the smell of fresh and burnt marijuana;
28  she did not recognize an odor of marijuana at Defendant's residence during her visit.

**9.     Testimony of Billy Terrazas**

Mr. Terrazas testified on behalf of Defendant. Mr. Terrazas is Defendant's employer. He visited Defendant's house the day before his arrest to pay him; during his visit he walked through the downstairs area and out to the backyard. He was at the residence for 20 or 25 minutes. Mr. Terrazas is familiar with the odors of fresh and burnt marijuana. He did not notice a smell of marijuana at Defendant's residence during his visit.

**10.    Testimony of Shelly Teague**

Ms. Teague testified on behalf of Defendant. Ms. Teague is Defendant's mother. Ms. Teague was in Defendant's residence three times on the day before his arrest. Ms. Teague is familiar with the odors of fresh and burnt marijuana. She did not notice a smell of marijuana at Defendant's residence during her visits.

**11.    Testimony of Victoria Teague**

Ms. Victoria Teague testified on behalf of Defendant. Ms. Victoria Teague is Defendant's sister. Ms. Victoria Teague stopped by Defendant's house at approximately 6:45 a.m. on the morning of his arrest. She visited with Defendant in the entry way of the residence for a brief period of time. Ms. Victoria Teague is familiar with the odors of fresh and burnt marijuana. She did not detect the odor of marijuana in Defendant's house on the date of his arrest.

**12.    Testimony of Priscilla Trevino**

Ms. Trevino testified on behalf of Defendant. Ms. Trevino is Defendant's live-in girlfriend; she and Defendant have a two year-old daughter together. Ms. Trevino testified that she was in the residence on the date of the arrest. Ms Trevino is familiar with the odor of marijuana because Defendant smokes it. Ms. Trevino testified that she was not aware of the odor of marijuana in the residence on the date of Defendant's arrest.

According to Ms. Trevino, Defendant smokes marijuana in the garage but not in the house because Ms. Trevino does not permit him to smoke near the children. Ms. Trevino also testified that it was Defendant's practice to store marijuana in the garage, carry the marijuana into the house to roll marijuana joints over the master bedroom sink and tub, then

1  carry the marijuana back outside and smoke the joints in the garage. Ms. Trevino was not
2  aware that Defendant stored marijuana in the kitchen or bedroom.[4] Ms. Trevino was aware
3  that Defendant had stored some hydroponic marijuana in the master bathroom.
4  Ms. Trevino provided testimony regarding the residence. She stated that there are two
5  doors between the entry and the attached garage. She also stated that she kept air freshener
6  "plug-ins" in almost every plug in the house in order to mask household odors and make the
7  house smell nice. Ms. Trevino also testified that the doors to the master bedroom and closet
8  within the master bedroom were closed on the date of Defendant's arrest. Ms. Trevino also
9  stated that the large scale discovered in the residence had been left behind by a previous
10 tenant.

**13.    Testimony of Defendant**

Defendant testified that there was no odor of marijuana in his residence on the date of his arrest. According to Defendant, the marijuana discovered in his home had been there for approximately two weeks before his arrest. On the morning of his arrest, Defendant moved marijuana ordinarily kept in the garage into his vehicle to conceal it from expected visitors. He described the marijuana stored in the vehicle as old marijuana without an odor, packaged in sealed plastic bags inside a backpack. Defendant stated that he also had small quantities of marijuana on his workbench in the garage, including used joints inside a coffee mug. Defendant smoked marijuana in the garage because his girlfriend did not like him smoking it in the house around the children. Defendant kept a small amount of marijuana in the master bathroom so that when he woke up he could roll a joint over the tub or sink and then walk out to the garage to smoke it. The marijuana in the master bathroom was kept in a jar and Defendant did not believe that the odor would permeate through the jar. Defendant testified that the residue in the tub was from the previous day. Defendant also testified that he and his girlfriend shower daily.

---

[4] Ms. Trevino offered somewhat inconsistent testimony regarding the marijuana found in the bedroom, stating first that Defendant kept marijuana in the bedroom but the kids weren't allowed in the bedroom (TR 186) and then later stating that she did not know about the marijuana discovered in the bedroom. (TR 187.)

1   Defendant testified that on June 23, 2010, the date of the search, he received a call
2 from Ms. Trevino, who informed him that police were at his residence. He returned home
3 approximately 20-30 minutes later. He did not immediately go to the front of the house
4 where he knew the officers were present with his girlfriend and child. Rather, Defendant
5 jumped the back fence, entered his house through the back sliding glass door, and locked the
6 door to the house.

7   On October 20, 2010, Defendant was indicted on one count of possession with intent
8 to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and
9 § 841(b)(1)(D) and one count of possession of firearms in furtherance of a drug trafficking
10 offense in violation of 18 U.S.C. § 924(c)(1)(A)(i).

## ANALYSIS

12   Defendant contends that evidence was seized from his residence in violation of his
13 Fourth Amendment rights because (1) the search warrant issued was based upon false
14 statements and therefore not supported by probable cause; (2) the warrant was overly broad;
15 and (3) Defendant's vehicle was illegally searched.[5]

**1.   The search warrant did not contain a false statement**

17   An affidavit in support of a search warrant demonstrates probable cause if, under the
18 totality of the circumstances, it reveals a fair probability that contraband or evidence of a
19 crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).
20 If the Court determines that an affidavit contains a misrepresentation, the information is

---

[5] In his Motion to Suppress, Defendant also argued that the government had failed to obtain certification of the warrant application by the issuing magistrate as required by Fed. R. Crim. P. 41(d)(3)(B). (Doc. 34, pg. 10.) On April 1, 2011, the Court issued an Order requiring Defendant to produce a copy of the affidavit in support of the search warrant for the Court's review; in that Order the Court noted that because the challenged warrant was issued through state court the Federal Rules did not apply. (Doc. 42.) In his Reply and at the close of the evidentiary hearing, Defendant contended that state law also required certification. Although the Court may evaluate the validity of a warrant based on the applicable state warrant requirements, *see Mills v. Graves*, 930 F.2d 729, 734 (9th Cir. 1991), Arizona law does not support Defendant's argument that lack of certification justifies granting the motion to suppress. *See State ex rel. Collins v. Superior Court of State of Ariz., In and For Maricopa County*, 629 P.2d 992 (Ariz. 1981) ("If a magistrate has probable cause to issue a search warrant, that warrant should not be invalidated by hypertechnical interpretation.")

1    excised from the affidavit and the warrant is re-read to determine whether, under the totality
2    of the circumstances, probable cause exists. *See Franks v. Delaware*, 438 U.S. 154, 156
3    (1978). If the search warrant is not supported by a showing of probable cause, the fruits of
4    the search must be suppressed. *Id*.

5    In the present case, the affidavit supporting the search warrant contains the sworn
6    statement of Tucson Police Department Detective Ewings. In the affidavit, Detective Ewings
7    swears that when a female opened the door to the residence where ATF agents were
8    conducting a knock and talk, the agents "immediately smelled a strong odor of fresh
9    marijuana coming from inside the residence." Defendant contends that Detective Ewings'
10   statement must be false because, in light of the amount of and placement of marijuana
11   subsequently found in the residence, it is not possible that officers could have smelled fresh
12   marijuana while standing at the front door.

13   Agent Wayas, Agent Brandt and Detective Ewings each offered credible testimony
14   that they could detect the strong odor of marijuana from the front door of the residence. In
15   addition, even Detective Bynum, who was called by Defendant, testified that there was an
16   "overwhelming" odor of marijuana in the residence. Each of the agents/detectives had
17   considerable training and experience regarding the odors of fresh and burnt marijuana. Each
18   of them described the odor as immediate, overpowering and pervasive. Agent Wayas, Agent
19   Brandt and Detective Ewings also testified that marijuana odor can linger and permeate.
20   Their testimony regarding the strong odor of marijuana was supported by the evidence
21   discovered in the residence; marijuana was found in several rooms of the house and in the
22   garage. Some of the marijuana discovered in the residence was hydroponic; the agents
23   testified that hydroponic marijuana has a much stronger odor than commercial marijuana.

24   Each of the defense witnesses denied that an odor of marijuana could be detected in
25   the residence. However, none of the defense witnesses was present at the residence at the
26   time of the knock-and-talk.[6] Their testimony that they did not smell marijuana in the

---

[6] The Magistrate disregards the testimony of Defendant and Ms. Trevino, because their testimony was contradictory and implausible. For example, Priscilla Trevino testified that

- 11 -

1 residence one or two days before Defendant's arrest, or even on the morning of his arrest,
2 was not as relevant as the testimony of the officers who conducted the knock-and-talk and
3 executed the search warrant.

4 Many explanations were suggested as to why the officers smelled marijuana and the
5 other witnesses did not. As the government pointed out in its closing, Defendant could have
6 brought marijuana into the house sometime after Mr. Mahadocon and Ms. McCauley, who
7 were the last witnesses to enter Defendant's house before his arrest, had departed.
8 Alternatively, the evidence suggests that more marijuana may have been present in the house
9 but that Defendant sneaked into the house and deposited an unknown quantity of marijuana
10 down sinks and drains while the agents waited for the search warrant.[7] This unknown
11 quantity of additional marijuana may also have contributed to the odor in the residence. The
12 explanation for the conflicting testimony is not known; but it is also not material. The
13 Magistrate Judge finds no basis to reject the testimony of the officers on the scene at the time
14 of the application for the warrant, who each credibly testified as to the overwhelming smell
15 of marijuana present at the residence. In sum, the Magistrate finds that the search warrant
16 was not premised on a false statement and was based on Detective Ewings' credible

---

Defendant's practice was to bring marijuana from the garage into the house, roll it over the sink or tub, then take it back into the garage to smoke it so as to avoid contact with the children. Ms. Trevino offered inconsistent testimony regarding whether she knew marijuana was stored in the bedroom. Defendant's testimony that the marijuana residue in the tub had been left there from some time in the past when he had rolled a joint over the tub was also not plausible. In addition, Defendant's and Ms. Trevino's testimony that Defendant only possessed marijuana for his personal use and that he only smoked the marijuana in the garage was not supported by the quantity of marijuana discovered throughout the house. Based on his experience as a law enforcement officer, Detective Ewings testified that the quantity of marijuana and the existence of drug ledgers, a scale and the large amounts of cash, was consistent with marijuana distribution.

[7] Although Defendant objected to the government's suggestion that he had "sneaked" into his house, the uncontradicted evidence established that after Defendant learned that police were at his residence, he asked Mr. Mahadocon to drop him off a street away from his house and then he climbed a wall into his backyard and entered the residence through the back door.

statement in his affidavit regarding the strong odor of marijuana. The statement provided probable cause for the issuance of the warrant to search Defendant's residence.[8]

**2.      The search warrant was not overly broad**

Defendant also argues that even if the warrant is supported by probable cause, it is overly broad. Specifically, Defendant contends that the odor of marijuana was enough to support probable cause to search for evidence of drug use, but not sufficient to justify a search for evidence of marijuana distribution and/or sale.

The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "This particularity requirement makes 'general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir.1982) (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). "To determine whether a warrant lacks sufficient specificity, we must examine both the warrant's particularity and its breadth." *United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995). Yet, "[w]hile a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996) (internal quotation marks and citations omitted).

---

[8] Defendant asserted additional somewhat cursory arguments to support his contention that the warrant lacked probable cause. Defendant suggests that agents improperly relied on Defendant's refusal to consent to search as a basis for their warrant application. Review of the transcript of the telephonic application for the search warrant, however, indicates that Detective Ewings sought a warrant because he and other agents immediately smelled a strong odor of fresh marijuana coming from inside the residence. (Doc. 43-1, pg. 3.) Defendant also suggests the government's primary purpose in applying for the search warrant was to search for weapons. The government denies this suggestion. Even if the government's primary purpose was to search for weapons, that fact would be immaterial. The relevant inquiry is whether the agents had probable cause to search the residence and to seize the items listed in the affidavit. *See Whren v. United States*, 517 U.S. 806, 814 (1996) (actual motivations of officer irrelevant).

1   In the present case, Detective Ewings stated in his warrant application that he was
2   investigating Defendant for the crime of unlawful possession of marijuana for sale based
3   upon the fact that agents could smell a strong odor of fresh marijuana coming from inside the
4   residence. Detective Ewings also stated that, based upon his training and experience, drug
5   dealers frequently possess weapons to protect themselves, their drugs and the proceeds of
6   their illegal activities. Accordingly, the warrant itemized the following items to be seized:

> indicia of occupancy, residency and/or ownership of the premises and/or vehicles described; monies, property and/or proceeds related to criminal activities; weapons and/or deadly instruments; any electronic communications device and stored information; marijuana, dangerous drugs and/or narcotic drugs; paraphernalia for using, packaging, cutting away and distributing marijuana, dangerous drugs and/or narcotic drugs; notes, ledgers, telephone records and/or other papers and records related to the possession, manufacture, transportation, transfer, sale and/or distribution of marijuana, dangerous drugs and/or narcotic drugs; any of the fruits and instrumentalities in evidence of the crimes and/or crimes of possession, manufacture, transportation, transfer, sale and/or distribution of marijuana, dangerous drugs and/or narcotic drugs, together with other fruits, instrumentalities and evidence of the crimes of: unlawful possession of marijuana for sale.

(Doc. 43-1, pgs. 1-2.)

The presence of the odor of contraband may itself be sufficient to establish probable cause that defendant is in possession of marijuana with intent to distribute. *United States v. Kerr*, 876 F.2d 1440 (9th Cir. 1989). In the present case, Detective Ewings' affidavit contained sufficient allegations to establish probable cause to search for evidence of drug sales. Drug ledgers, firearms and monies all constitute such evidence. In addition, once the police were lawfully searching the residence for marijuana (for use or sale) they were permitted to seize any other evidence that was in plain view, if its incriminating nature was immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990). The other items seized in the search were all discovered in places where marijuana might be stored.

**3.     The search of Defendant's vehicle was permissible**

Defendant contends that his vehicle was searched in violation of his Fourth Amendment rights because the warrant did not extend to the vehicle and no exigent circumstances existed which would justify a warrantless search of the vehicle. However, Defendant's vehicle was located in a garage attached to the residence. The warrant

1  authorized search of the residence, and "no reason exists to distinguish an attached garage
2  from the rest of a residence for Fourth Amendment purposes." *United States v. Frazin*, 780
3  F.2d 1461, 1467 (9th Cir. 1986).  Although the Ninth Circuit has not directly addressed the
4  issue, several other circuits have held that a search warrant authorizing a search of a certain
5  premises generally includes any vehicles located within its curtilage if the objects of the
6  search might be located therein.  *See United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th
7  Cir. 1990) (collecting cases).

## CONCLUSION

9  　　　In view of the foregoing, it is recommended that, after its independent review of the
10 record, the District Court DENY Defendant's Motion to Suppress filed on March 14, 2011.
11 (Doc. 34.)  The parties have **fourteen (14) days** to serve and file written objections to the
12 Report and Recommendation.  The parties are advised that any objections should be filed
13 with the following caption: **CR 10-2903-TUC-RCC.**
14 　　　DATED this 20th day of May, 2011.

　　　　　　　　　　　　　　Jennifer C. Guerin
　　　　　　　　　　　　　　United States Magistrate Judge